COMMONWEALTH
*vs*
GRIFFIN.

---

INDICTMENT.

## Commonwealth *vs* Griffin.

ERROR TO THE PULASKI CIRCUIT.

*Case* 62.

*Prison rules. Importation of slaves.*

*October* 20.

JUDGE MARSHALL delivered the opinion of the Court.

The case stated.

JAMES W. GRIFFIN, a citizen of Pulaski county in this State, having been found guilty, under an indictment against him for importing a slave into this state, in viola-tion of the statute of 1833, (*Stat. Law,* 1482,) judg-ment was pronounced against him for the statutory pen-alty of $600; and he being in Court upon his recogni-zance, not to depart without leave, and was by a sepa-rate order, at the foot of the judgment, committed to jail until he should pay the penalty or be discharged by law. On a subsequent day of the same term, on motion of Griffin's counsel, a rule was made upon the jailer to show cause why the prisoner should not be admitted to the pris-on rules or bounds; and the jailer having returned for cause, the manner and cause of his imprisonment, the Court ordered that he should be admitted to the prison rules upon executing bond.

Questions for consideration.

To this order of the Court the Commonwealth, by her attorney, excepted, and has brought the case to this Court for its reversal. And the defendant, Griffin, having also excepted to various opinions of the Court in giving and refusing instructions, and in overruling his motion for a new trial and in arrest of judgment, cross errors have been assigned on his part, for the reversal of the principal judgment.

The order of a Circuit Court, made on a rule directing their jailer to admit to

With regard to the order directing the prisoner to be admitted to the prison rules, we are of opinion, that it is advisory and incidental only, revocable at any time until actually executed, and even then perhaps, revocable in

effect, under the power of the Court to order a *capias pro-* *fine,* and to direct that the defendant, when taken under that writ, should not be admitted to the prison rules.

COMMONWEALTH
*vs*
GRIFFIN.

the prison rules, one who stands committed by such Court for a failure to pay a judgment for a fine rendered by such Court, is only advisory, & not subject to reversal by this Court.

We are of opinion, therefore, that the order in question not being final in its nature, this Court has no jurisdiction to revise or reverse it, nor any power in this form, to control the Circuit Court in the exercise of its discretion in regard to the treatment of prisoners by the jailer. We would remark, however, that by the 6th section of an act of 1796, (*Stat. Law,* 1332,) it is expressly enacted that every prisoner not committed for treason or felony, shall upon giving security, &c. have liberty to walk within the prison rules for his health, and keeping continually within the said bounds, shall be adjudged in law a true prisoner. It is also declared by an act of 1810, (*Stat. Law,* 427,) that the privilege of the prison bounds shall not be extended to any person who shall, by the judgment of any tribunal or magistrate, be sentenced to imprisonment. And by an act of 1822, the prison bounds are made co-extensive with the limits of the Commonwealth, with a proviso that the act shall not be construed to abolish imprisonment for riots, routs, and breaches of the peace. Now, as we suppose, a prisoner ordered by the Court, after judgment, to stand committed until he shall pay the fine adjudged against him, cannot fairly be said to have been sentenced to imprisonment by the judgment of the Court; it seems to follow that such a prisoner is not, by the act of 1810, deprived of the privilege of the prison rules, which is allowed him by the act of 1796. And although we may be satisfied that the statute of 1822, extending the prison bounds to the limits of the State, did not intend to operate upon the remedy of the Commonwealth for enforcing penalties, by commitment or by *capias profine,* but was intended to apply only to the remedy for the enforcement of debts properly so called, still there might be a difficulty in coming to the conclusion that there are any other prison bounds since the passage of that act, except such as are established by it. And if there be no other, then it would seem to follow, either that by the extension of the prison bounds the act of 1822 has repealed the act of 1796, so far as it allows

COMMONWEALTH
vs
GRIFFIN.
the privilege of the bounds in penal cases, which it might be difficult to establish, or that prisoners committed, not under a sentence of the Court and for punishment, but for the purpose and as a means of coercing payment of the penalty adjudged against them, being entitled by the act of 1796, to the privilege of the prison bounds, have a right to those bounds as they exist at the time of claiming the privilege, the effect of which would be to deprive the Commonwealth in many cases, of the only efficient remedy for coercing pecuniary penalties, and for even coercing the appearance of persons charged with offences below the grade of treason or felony.

Consequences so injuriously affecting the interests of the State, so evidently contrary to its policy, and so destructive of the efficacy of its penal laws, may be presumed not to have been intended, and might, perhaps, justify the judiciary in giving a construction to some or all of these acts which would seem scarcely to be authorized by their language. But the remedy for the difficulty seems to belong more properly to the Legislature than the judiciary. And as the questions arising on these statutes are not brought before us in such a manner as to be judicially decided, we have presented them, not for the purpose of solving them, but with the view merely of making them known.

As the order, for the reversal of which the Commonwealth has prosecuted her writ of error, is not within the jurisdiction of this Court as a revising tribunal, the writ of error is quashed.

By the cross errors assigned by the defendant, several grave questions are made :

The power of the Legislature, by the constitution of Kentucky, to prevent the importation of slaves into this State by the citizens thereof, is plenary and absolute.

1. It was objected in arrest of the judgment rendered on the indictment, that the act of 1833, imposing a penalty of $600 upon any person importing a slave contrary to its provisions, is in violation of the 1st section of the 8th article of the Constitution of Kentucky. But to this objection we answer, that so far as the Constitution of Kentucky is concerned, the power of the Legislature to prohibit and prevent, by reasonable penalties, the importation of slaves into this Commonwealth, would be plenary and absolute, were it not for the restriction con-

tained in the section referred to ; that the only restriction contained in that section is in favor of emigrants to this State bringing slaves with them, and that, consequently, the power of preventing such importation by citizens of the State being unaffected by the restriction, is plenary and absolute. It is, therefore, unnecessary to decide whether the act violates the restriction in favor of emigrants or not, since even if it does, it does not violate any consti. tutional privilege of the defendant, who being already a citizen and not an emigrant, when he imported the slave, can claim no benefit from the restriction, but was and is subject to the absolute power of prohibition.

2. It is contended that the act is in ˙violation of the first clause of the second section of the fourth article of the Constitution of the United States, which secures to citizens of each State all the privileges and immunities of citizens in the several States. The violation of this clause is supposed to consist in denying to citizens of the State the privilege of importing slaves, allowed to citizens of other States. But waiving the consideration that the conditions of the two classes between whom the distinction is made, are so entirely different, that the privilege of introducing slaves is not the same privilege when applied to both classes; and waiving also the question, whether this is one of the privileges intended to be secur‑ ed by the clause referred to, it is sufficient to say that that clause was intended to secure the citizens of one State against discriminations made by another State, in favor of its own citizens, and not to secure the citizens of any state against discriminations made by their own State in favor of the citizens of other States, nor to secure one class of citizens against discriminations made between them and another class of citizens of the same State. Notwithstanding this clause then, Kentucky may prohibit those who are already her citizens from bringing slaves into the State while she invites those who are not now her citizens, to become so by allowing them to bring their slaves with them.

3. It is further objected, that the act is in violation of the 3d clause of the 8th section of the 1st article of the Constitution of the United States, which gives to Con-

COMMONWEALTH
vs
GRIFFIN.

The prohibitory clause of the 2d sec. of the 4th art. of the Constitution U. S. was intended to secure the citizens of one State against discriminations made by another State in favor of its own citizens, and does not prohibit Kentucky from preventing, by appropriate penalties, the importation of slaves by her own citizens.

The 3d clause of the 8th sec. of the Constitution U. S. respecting the 1st art. of the

COMMONWEALTH
vs
GRIFFIN.

regulation of commerce between the states, does not conflict with the right of each State to determine whether and to what extent the rights of property in persons of the African race shall be recognized within its own territories—except so far as the third clause of the 4th art. Con. U. S. secures the right of property in fugitive slaves, against the legislation of any State; or the right of Congress under the 3d clause of the 8th sec. of the 1st art. to provide for the *transit* of slaves as articles of property or commerce thro' the states.

gress the power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." But whatever power Congress may possess under this clause to regulate the transit or transportation of slaves as the subject of property, or as articles of commerce among the several States, which may recognize them as subjects of property and articles of commerce, we regard it as a fundamental proposition, and it is one which, so far as we know, is denied by no citizen of the United States, that each State possesses the unquestionable right of determining for itself, whether and to what extent the right of property in persons of the African race shall be recognized within its own territory, subject only to the provision of the 3d clause of the 4th Article of the Federal Constitution, which secures the right of property in fugitive slaves, against the legislation of any State in which such right of property is not generally recognized, and subject also to any power which Congress may have under the 3d clause of the 8th Section of the 1st Article, to provide for the transit of slaves as articles of commerce or as subjects of property, through states which do not by their own laws recognize them as such.

Whether Congress has or has not the right under this power of regulating commerce, to force or protect the transit of slaves, as subjects of property or of commerce through a State whose laws do not admit of such property, need not be a question in this case. It certainly has no right under this power, to say that they shall, or that they shall not be held as property within any State, further than may be implied in the power to protect the right of the owner in them, in their transit from one State to another through a third. Further than this it has no right to say they shall or shall not be imported into any State, because each State has the right to say whether they shall or shall not be held and treated as property by its citizens within its territory. It is impossible, therefore, that the law of any State prohibiting the importation of slaves in its territory, can impinge upon this power of Congress, except so far as it may prohibit their transit as articles of commerce or of property.

As the rights of each and of all the States on this subject are equal and the same, and as the power of Congress in regard to each of the States is the same, it follows that Kentucky, though recognizing slavery, has the same right to prohibit the importation of slaves that is possessed by any State which does not recognize slavery, and Congress has no more power in regulating commerce among the States, to authorize the importation into one State than into another. The right of each State to authorize or prohibit absolutely or conditionally, the importation of slaves, is a part and an essential part of its right of determining whether slavery shall or shall not exist within its limits. And it cannot surrender the former right without a virtual surrender of the latter.

Conceding that the power to prohibit the importation of slaves into the United States from foreign countries, is included in the grant of power "to regulate commerce with foreign nations," and that this is provided by the 1st clause of the 9th Sec. of the 1st Art. of the Constitution, still it does not follow, that under this grant Congress had power to authorize, unless for the mere purpose of transit, the importation of slaves into such of the States as did not allow them to be held as slaves within their territory. Nor in our opinion does it follow, that because the power to regulate foreign commerce includes the power to prohibit the importation of slaves into such States as were willing to admit them; it must be also admitted that the power to regulate commerce among the several States, includes the power either of prohibiting or of authorizing the importation of slaves into one State from another. For although the power to regulate is given in the same words in each of these cases, and also in the case of the Indian tribes, yet as the subject to be regulated is different in each case, and as the relation in which Congress stands to the parties is also different, there is not only room for giving different effect to the same granting words in the several cases, but there may be, and as we think, is good reason for so doing. Surely it cannot be that Congress may exercise the same powers in regulating commerce among the States, as it exercises in regulating commerce with the Indian tribes. And if this be admit-

COMMONWEALTH
*vs*
GRIFFIN.

ted, it must also be admitted that the identity of the language in which the power is given to regulate commerce with foreign nations, and among the several States, does not prove that the power itself is, as to its extent and the modes of its legitimate exercise, identical in both cases.

It is not our purpose to discuss the ground of this distinction, or to trace its consequences. We have adverted to it merely to show the inconclusiveness of the argument drawn from the admitted right of Congress, under the power of regulating foreign commerce, to prohibit the importation of slaves, even into those States whose laws did not contain any such prohibition. With regard to the general subjects of commerce, although Congress possesses, and may often be bound to exercise the power of permitting or restricting, of even prohibiting the importation of particular articles from foreign countries, we are not prepared to admit, and neither affirm nor deny that there is any such power of restriction with respect to the commerce among the States. Nor do we perceive that there could be any occasion for exercising the power, if it exists, of actively interposing to permit the importation or coercing the admission of any article into one State from another, against the consent of the former, unless for the purpose of counteracting such discordant or hostile legislation as might be at any time attempted on the part of a particular State. And for the prevention of such legislation, the power may have been given to Congress.

The right of property and commerce in slaves is peculiar, and not subject to the ordinary rules which distinguish other property—and is the subject of internal regulation by the States respectively, and over which Congress has no power.

But slavery and slave property, and commerce in slaves, are matters of a peculiar character, standing on grounds which distinguish them in all their relations, from the general subjects of property and of commerce. And whether slavery shall exist in a State, and whether if it does exist to some extent, it shall be increased by the importation of slaves from other States; in a word, whether slaves shall be an article of commerce at all, between one State and another, are questions peculiarly of internal regulation in the several States, and over which Congress has no power. They are questions which must be determined by each State for itself, before the importation of slaves into its territory, to be held as such by its citizens, can become the subject of commercial regula

tion, or be brought within the power of regulating commerce among the States. The determination of these questions by each State for itself, cannot produce discord nor hostility among the States, but the denial of the right to the State and its exercise by Congress, would necessarily and fatally disturb the peace and harmony of the Union. The Constitution does not negative this right, but is based upon its implied recognition, as the Union itself is upon its continued existence and practical acknowledgment.

4. In intimating that the right of a State to prohibit the importation of slaves might be qualified by a right in Congress to protect the transit of slaves as articles of commerce from one State to another, through a third, we have used the word importation or import in its strictly literal sense, as signifying merely, bringing into, or to bring into the State. But the word to import may be understood as meaning "to bring in," as a part of the property of the State, to be held for use or sale. And in this sense the power of a State to prohibit the importation of slaves does not come in conflict with the power of Congress, if it exists, to protect their transit through a State, as it certainly does not with any other power or prohibition contained in the Constitution. But whether the word "import," in the act of 1833, is used in one or the other of the significations above pointed out, and whether Congress has the power to protect the transit of slaves through any State, against its laws, or whether if there be such power, its mere existence in the Constitution, unexercised by Congress, is a negation of the power of a State to prevent or prohibit the transit of Slaves through its territory, are questions which need not be decided in this case. For although the defendant, by the evidence which he introduced, and by an instruction asked from the Court, seems to have endeavored to place himself in the condition of having attempted merely a transit or transportation of the Slave, as merchandize, from the State of North Carolina to the State of Tennessee, through the State of Kentucky, and now claims the benefit of that condition; we are of opinion that he has entirely failed to bring himself within it. It appeared in evidence that he introduced

COMMONWEALTH
*vs*
GRIFFIN.

the slave into this State nearly three months before the finding of the indictment; that he had not, up to that time, transported her from the State, but had, in the interim, authorized and attempted a sale of her within it; and that afterwards, and before the trial, he did in fact, sell her within the State, and it is not certain that she has ever yet been taken out of it. When applied to these facts, the evidence, that when he bought the slave in North Carolina, he said he did not intend to bring her to Kentucky, and that after his arrival with her in this State, he said he intended to take her out of the State as soon as he could conveniently do so ; that he said on one occasion, that he was on his way with her to Tennessee, and that on another occasion he said he had sold her to a man from Indiana, who was going to take her to the south, is wholly insufficient to make this a case of mere transit or transportation through the State. Under the most favorable construction of the statute, and of the Constitution, the jury was bound to find him guilty, and he cannot complain of the refusal of the instruction asked for by him. That instruction imported that the jury might find that when the defendant purchased the slave in North Carolina, he did not intend to bring her to Kentucky, and also, that he had carried out that intention by taking her, or causing her to be taken from Kentucky to another State, and that upon finding these two facts, they should acquit him. We need scarcely say, that if such proof as was adduced of the assumed intention, and of its effectuation, is to be allowed as a sufficient ground of acquittal under this statute, though the statute might still operate to prevent the importation of slaves for the use of the importer, it would be wholly inefficacious to prevent their importation as merchandize. There was no error in refusing the instruction asked for by the defendant, and although that which was asked for by the plaintiff may, perhaps, have been too general, as an abstract proposition, it was correct in its application to this case, and could not have misled the jury.

Wherefore, the judgment is affirmed.

*Cates, Attorney General*, for Commonwealth: *Owsley & Goodloe* for defendant.